Alamance Family Practice, P.A. v. Lindley, 2018 NCBC 82.

STATE OF NORTH CAROLINA

ALAMANCE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 913

ALAMANCE FAMILY PRACTICE, P.A.,

Plaintiff,

v.

CHERYL LINDLEY and JEFF KIMBALL, Individually and d/b/a PREFERRED PRIMARY CARE, PLLC,

Defendants.

**ORDER AND OPINION ON DEFENDANTS' MOTION TO DISMISS**

1. **THIS MATTER** is before the Court on Defendants' Rule 12(b)(6) Motion to Dismiss (the "Motion") filed on June 26, 2018. For the reasons set forth herein, the Court **GRANTS** the Motion.

*Whited, Doby & Ray, by Julian M. Doby, for Plaintiff.*

*The Noble Law Firm, PLLC, by Jennifer L. Bills and Kathryn F. Abernethy, for Defendants.*

Robinson, Judge.

## I.    FACTUAL BACKGROUND

2. The Court does not make findings of fact on a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)") but only recites those factual allegations of the Amended Complaint that are relevant and necessary to the Court's determination of the Motion.

3. Plaintiff Alamance Family Practice, P.A. ("Plaintiff") is a North Carolina professional corporation with an established medical practice that has treated patients since 1989. (Am. Compl. ¶¶ 1, 27, ECF No. 3.) Plaintiff treats many patients and families for ongoing medical issues. (Am. Compl. ¶ 27.)

4. Defendant Cheryl Lindley ("Lindley") is a North Carolina resident and a licensed nurse practitioner who was hired by Plaintiff in July 2013 to work in Plaintiff's medical practice. (Am. Compl. ¶¶ 2, 8; Am. Compl. Ex. A, ECF No. 4.2.)

5. Defendant Jeff Kimball ("Kimball") is a North Carolina resident who worked as Plaintiff's office manager since before Lindley was hired. (Am. Compl. ¶¶ 3, 6.) As part of his role as Plaintiff's office manager, Kimball set up Plaintiff's e-mail account as alamancefp@yahoo.com. (Am. Compl. ¶ 15.)

6. Defendant Preferred Primary Care, PLLC ("PPC") is a North Carolina professional limited liability company formed by Lindley in 2016. (Am. Compl. ¶¶ 4, 11.)

7. When Plaintiff's owner, Dr. Meindert Niemeyer, agreed to employ Lindley, Plaintiff and Lindley executed an employment agreement on July 15, 2013 for a term of one year. (Am. Compl. ¶ 8, Ex. A.) Pursuant to the employment agreement, Plaintiff and Lindley stood in an employer-employee relationship. (Am. Compl. Ex. A, § 3.) As part of the agreement, Lindley agreed to maintain her professional licenses and "devote her utmost knowledge and best skill to the care of such patients as shall be entrusted to her." (Am. Compl. Ex. A, §§ 1, 5, 12.)

8. The employment agreement obligated Lindley not to disclose "any information relating to [Plaintiff], its officers, employees, or patients, including information regarding the affairs or operation of [Plaintiff], to any third parties during or after the term of [the] [a]greement without the prior written consent of [Plaintiff.]" (Am. Compl. Ex. A, § 5.) The agreement further provided that Lindley

> agreed to treat all matters and information related to [Plaintiff]'s business, including . . . lists and identities of patients, as confidential information entrusted to the parties solely for their use in the performance of this [a]greement, and not to use such information or divulge, disclose, or communicate such information in any way to any person or entity (other than to an officer, employee, or authorized agent of [Plaintiff] for use in the business of [Plaintiff]) during the term of this [a]greement and any renewals thereof, and thereafter.

(Am. Compl. Ex. A, § 18.)

9. In addition, the agreement prohibited Lindley, during the term of the agreement and any renewals, from being "an owner, employee or agent of any business, partnership or limited liability company engaged in the practice of medicine" unless she obtained Plaintiff's prior written permission. (Am. Compl. Ex. A, § 17(e).)

10. After the initial one-year term of Lindley's employment agreement, Lindley and Plaintiff agreed to renew the contract. (Am. Compl. ¶ 9.)

11. Between 2015 and 2018, Kimball helped Lindley to establish Piedmont Diagnostic Services, LLC ("PDS"), a separate business formed to provide allergy testing for patients. (Am. Compl. ¶ 11.) Kimball and Lindley established PDS without Dr. Niemeyer's knowledge or consent and began ordering allergy testing supplies and storing them at Plaintiff's medical practice and conducting the allergy

tests in Plaintiff's medical offices.  (Am. Compl. ¶ 11.)  Lindley then used a fictitious address to form PPC in 2016 to operate within Plaintiff's practice.  (Am. Compl. ¶ 11.) PPC would conduct allergy testing and buy the allergy kits necessary to do such testing from PDS.  (Am. Compl. ¶ 11.)

12.     At some point, Dr. Niemeyer discovered Lindley's operation and asked that she cease conducting allergy tests at Plaintiff's practice because it was unauthorized and more patients were referred for testing than necessary.  (Am. Compl. ¶ 12.)  In response, Lindley offered to provide Dr. Niemeyer a referral fee (or a "kickback") for allergy testing, but Dr. Niemeyer refused because he believed such an arrangement would be illegal.  (Am. Compl. ¶ 12.)

13.     At some point between 2015 and 2018, Kimball began giving himself unauthorized pay raises and also began paying to himself and Lindley other unauthorized benefits, including cell phone payments, gym memberships, fees for seminars, and professional association dues.  (Am. Compl. ¶¶ 13, 15.)  Some of these benefits were paid after Lindley and Kimball had decided they would leave Plaintiff's practice.  (Am. Compl. ¶ 15.)

14.     In the fall of 2017, Kimball told Dr. Niemeyer that Lindley would be leaving Plaintiff's practice soon.  (Am. Compl. ¶ 14.)  Around that same time, Lindley began telling Plaintiff's patients that she would be moving to her own practice and gave them notice of her change of employment on Plaintiff's letterhead.  (Am. Compl. ¶ 15.) Lindley and Kimball also began telling Plaintiff's patients that Plaintiff's owner Dr. Niemeyer was about to be "shut down" and that he would no longer be able to treat

patients. (Am. Compl. ¶ 54.) In addition, Kimball and Lindley accessed Plaintiff's confidential business and patient information that was stored in Dr. Niemeyer's electronic database in order to use the information to solicit Plaintiff's patients to leave Plaintiff's practice and seek treatment at PPC. (Am. Compl. ¶ 18.)

15. At some point during the relevant time period, Kimball refused to let anyone else access the Yahoo! e-mail account that Kimball had previously set up for Plaintiff. (Am. Compl. ¶ 15.) The e-mail account contains valuable communications regarding Plaintiff's patients and billing. (Am. Compl. ¶ 35.)

16. On February 1, 2018, Lindley e-mailed Dr. Niemeyer to inform him that she would be leaving Plaintiff's practice. (Am. Compl. ¶ 17.) On February 20, 2018, Lindley refused to see more than five patients per day until she left the practice and then told Dr. Niemeyer that February 20 would be her last day. (Am. Compl. ¶ 17.)

## II. PROCEDURAL HISTORY

17. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

18. Plaintiff initiated this action by filing its verified Complaint on May 11, 2018. (ECF No. 15.)

19. On May 29, 2018, Plaintiff filed its verified Amended Complaint. (ECF No. 3.) The Amended Complaint asserts claims against Lindley and Kimball for breach of contract; "intentional and negligent tortious interference with contract"; breach of duty of loyalty; and fraud, and requests that punitive damages be awarded. (Am. Compl. 3–5.) Plaintiff also asserts a claim for intentional misappropriation and use

of trade name against only Kimball and a claim for unfair and deceptive trade practices ("UDTP") against only Lindley. (Am. Compl. 4–5.)

20. This action was designated as a mandatory complex business case by order of Chief Justice Mark Martin of the Supreme Court of North Carolina dated June 12, 2018, (ECF No. 1), and was assigned to the undersigned by order of then-Chief Business Court Judge James L. Gale on the same date, (ECF No. 2).

21. The Motion was filed on June 26, 2018 and seeks dismissal, pursuant to Rule 12(b)(6), of all of Plaintiff's claims except for the breach of contract claim against Lindley.

22. The Motion has been fully briefed and the Court held a hearing on the Motion on August 8, 2018 at which all parties were represented by counsel.

23. The Motion is ripe for resolution.

## III.    LEGAL STANDARD

24. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations of the Amended Complaint in the light most favorable to Plaintiff. The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court construes the Amended Complaint liberally and accepts all allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).

25.     Where the pleading refers to and depends on certain documents, the Court may consider those documents without converting the motion into one for summary judgment under Rule 56. *Schlieper v. Johnson*, 195 N.C. App. 257, 261, 672 S.E.2d 548, 551 (2009). At the same time, the Court may not consider materials that are not mentioned, contained in, or attached to the pleading; otherwise, a Rule 12(b)(6) motion will be converted into a Rule 56 motion and subject to its standards of consideration and review. *Fowler v. Williamson*, 39 N.C. App. 715, 717, 251 S.E.2d 889, 890−91 (1979).

26.     Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports [the] claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985); *see also Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

27.     The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005). A "trial court can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the

complaint." *Laster*, 199 N.C. App. at 577, 681 S.E.2d at 862. The Court can also ignore a party's legal conclusions set forth in its pleading. *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013).

## IV. ANALYSIS

### A. **Breach of Contract**

28. The Amended Complaint alleges that Lindley and Kimball "breached the agreement between themselves and [Plaintiff]" by removing confidential patient information from Plaintiff's business, disclosing confidential patient information to PPC, and using Plaintiff's funds to pay for Lindley's professional memberships and programs and other benefits not provided for in the employment agreement. (Am. Compl. ¶¶ 20–23.) The Amended Complaint further alleges that Lindley breached her employment agreement by establishing a competing business while employed by Plaintiff. (Am. Compl. ¶ 24.)

29. Defendants seek dismissal of Plaintiff's breach of contract claim as to Kimball and PPC, arguing that the Amended Complaint fails to allege the existence of a valid contract between either Kimball or PPC, on the one hand, and Plaintiff, on the other. (Defs.' Rule 12(b)(6) Mot. Dismiss ¶¶ 1–2, ECF No. 6 ["Mot. Dismiss"]; Defs.' Br. Supp. Rule 12(b)(6) Mot. Dismiss 1–2, ECF No. 7 ["Defs.' Br. Supp."].) Plaintiff conceded, in its brief and at the hearing, that the Amended Complaint asserts a breach of contract claim against only Lindley. (Pl.'s Br. Resp. Defs.' 12(b)(6) Mot. Dismiss 1, ECF No. 10 ["Pl.'s Br. Opp'n"].)

30. Accordingly, to the extent the Motion seeks dismissal of a breach of contract claim against Kimball and PPC, the Motion is granted and Plaintiff's claim, as it relates to Kimball and PPC, is dismissed. Notwithstanding the Court's conclusion that this claim should be dismissed, "[t]he decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]" *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191, 749 S.E.2d 289, 292 (2013). The Court concludes, in the exercise of its discretion, that dismissal of Plaintiff's breach of contract claim against Kimball and PPC should be without prejudice to Plaintiff's right to attempt to reassert such claim.

**B.    Tortious Interference**

31. Plaintiff alleges that it has treated and continues to treat many of its loyal patients for ongoing medical issues but that Defendants accessed and used Plaintiff's confidential patient information to solicit patients to leave Plaintiff's practice and seek medical treatment at PPC instead. (Am. Compl. ¶¶ 27–28.) Specifically, Plaintiff alleges that from the fall of 2017 until February 2018, Lindley told Plaintiff's patients that she would be leaving Plaintiff and moving to her own practice and that Dr. Niemeyer would be shut down and no longer able to treat patients. (Am. Compl. ¶¶ 16, 18, 54.) Plaintiff further alleges that such conduct was done "intentionally and with malice" because Plaintiff would not permit Defendants to conduct their allergy testing business within Plaintiff's medical practice. (Am. Compl. ¶¶ 28–29, 31.) Plaintiff alleges that, as a result of Defendants' conduct, at least 100 of Plaintiff's patients have been solicited to seek treatment at PPC, thus amounting to tortious

interference with contract and tortious interference with prospective business relations. (Am. Compl. ¶¶ 29–30.)

32. Defendants argue that the Amended Complaint fails to state a claim for tortious interference with contract or prospective economic advantage because Plaintiff neither alleges the existence of a valid contract nor a prospective contractual relationship between Plaintiff and any of its patients. (Defs.' Br. Supp. 2.) Plaintiff counters that the Amended Complaint alleges enough information to put Defendants on notice of the basis for its tortious interference claims and that further facts will be provided through discovery. (Pl.'s Br. Opp'n 2–3.)

33. Plaintiff is correct that under North Carolina's notice pleading standard, a claim for relief need only set forth "[a] short and plain statement of the claim sufficiently particular to give the courts and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief[.]" N.C. Gen. Stat. § 1A-1, Rule 8(a)(1). "[D]espite the liberal nature of the concept of notice pleading, a complaint must nonetheless state enough to give the substantive elements of at least some legally recognized claim or it is subject to dismissal under Rule 12(b)(6)." *Stanback v. Stanback*, 297 N.C. 181, 204, 254 S.E.2d 611, 626 (1979); *see also Turner v. Thomas*, 369 N.C. 419, 444, 794 S.E.2d 439, 456 (2016) (notwithstanding the fact that Rule 8(a)(1) does not require detailed fact-pleading, "no amount of liberalization should seduce the pleader into failing to state enough to give the substantive elements of his claim"). Accordingly, and separate and apart from the question of whether a complaint gives

defendants adequate notice of the basis for a claim, dismissal is proper under Rule 12(b)(6) "when the complaint reveals on its face the absence of fact sufficient to make a good claim[.]" *Oates*, 314 N.C. at 278, 333 S.E.2d at 224.

34.     To state a claim for tortious interference with contract, a plaintiff must allege

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*Krawiec v. Manly*, 370 N.C. 602, 606–07, 811 S.E.2d 542, 546 (2018).

35.     "To establish tortious interference with prospective economic advantage, a plaintiff must show that the defendant, without justification, induced a third party to refrain from entering into a contract with the plaintiff, which would have been made absent the defendant's interference." *MLC Auto., LLC v. Town of S. Pines*, 207 N.C. App. 555, 571, 702 S.E.2d 68, 79 (2010). "However, a plaintiff's mere expectation of a continuing business relationship is insufficient to establish such a claim." *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 701, 784 S.E.2d 457, 463 (2016). "Instead, a plaintiff must produce evidence that a contract would have resulted but for a defendant's malicious intervention." *Id.*

36.     Viewing the allegations of the Amended Complaint as true and taking all reasonable inferences in Plaintiff's favor, the Court concludes that the Amended Complaint fails to adequately allege a claim for tortious interference with contract or prospective economic advantage.

37.     As to tortious interference with contract, the Amended Complaint nowhere alleges that Plaintiff's patients were contractually obligated to continue receiving treatment from Plaintiff.  Plaintiff's patients cannot be induced not to perform a contract that does not exist.  Therefore, the Court concludes that the Amended Complaint fails to state a claim for tortious interference with contract because it fails to allege the existence of a valid contract between Plaintiff and a third party.

38.     As to tortious interference with prospective economic advantage, the Court concludes that the Amended Complaint's allegation that Plaintiff's loyal customers received treatment from Plaintiff for ongoing medical problems is insufficient to show that Plaintiff had anything more than a mere expectation that its patients would continue seeking treatment from Plaintiff.  Plaintiff alleges no facts from which the Court can infer that Plaintiff's patients would have continued to seek treatment from Plaintiff but for Defendants' alleged conduct.  The Amended Complaint, therefore, fails to state a claim for tortious interference with prospective economic advantage.

39.     Accordingly, the Court concludes that Plaintiff's tortious interference claims should be dismissed and the Motion is granted as to that claim without prejudice.

## C.     Misappropriation of Trade Name

40.     Plaintiff alleges that Kimball, while employed by Plaintiff as an office manager, set up a Yahoo! e-mail account for Plaintiff using the e-mail address alamancefp@yahoo.com but would not let anyone else access the account or Plaintiff's financial information.  (Am. Compl. ¶¶ 6, 15.)  The Amended Complaint alleges a

claim for "intentional misappropriation and use of trade name" based on allegations that Plaintiff owns the Yahoo! account, which contains valuable communications regarding Plaintiff's patients and billing, but that Kimball has refused to turn over the password and has disabled the account. (Am. Compl. ¶¶ 34–35.)

41. Defendants contend that Plaintiff's claim for misappropriation of trade name should be dismissed as to Lindley and PPC because the Complaint fails to allege any facts showing that Lindley or PPC misappropriated or misused any trade name. (Defs.' Br. Supp. 4.) Plaintiff has conceded that the trade name claim relates only to Kimball. (Pl.'s Br. Opp'n 3.)

42. Defendants further contend that the misappropriation of trade name claim against Kimball must be dismissed because (1) Plaintiff does not allege that the e-mail account constitutes a protectable trade name and (2) Plaintiff fails to allege that Kimball used the e-mail address after the termination of his employment with Plaintiff. (Defs.' Br. Supp. 4–5.)

43. Usually, claims premised on misappropriation of a trade name are brought by a company that has acquired a proprietary interest in a trade name against a company that is using a confusingly similar name in the public sphere. *Two Way Radio Serv., Inc. v. Two Way Radio of Carolina, Inc.*, 322 N.C. 809, 814, 370 S.E.2d 408, 411 (1988) (citing R. Robinson, *North Carolina Corporation Law and Practice* § 4-1, at 52 (3d ed. 1983)). Here, Plaintiff does not allege that any Defendant is using a trade name that is confusingly similar to Plaintiff's trade name, but that Kimball is denying Plaintiff access to an e-mail account that uses an abbreviation for

Plaintiff's business name. (Am. Compl. ¶¶ 34–36.) The Court is not aware of (and Plaintiff has not alleged) a "misappropriation of trade name" claim that may be brought to remedy the conduct alleged. Nevertheless, the Court will proceed to analyze whether Plaintiff may state a valid claim were such a cause of action to be recognized by our courts.

44. "The law will afford protection against the tortious appropriation of tradenames and trademarks alike." *Charcoal Steak House of Charlotte, Inc. v. Staley*, 263 N.C. 199, 202, 139 S.E.2d 185, 187 (1964). "[A] corporate name (i.e., a trade name) is like a trademark to the extent that a proprietary interest therein can be acquired only by adoption and continuous use" *Two Way Radio Serv., Inc.*, 322 N.C. at 816, 370 S.E.2d at 412. However, "generic, or generally descriptive, words and phrases, as well as geographic designations, may not be appropriated by any business enterprise either as a tradename or as a trademark." *Id.* Thus, a geographic term, such as "Carolina," is by itself, a generic or descriptive term that is not protectable as a trademark. *Johnson & Morris, PLLC v. Abdelbaky & Boes, PLLC (Johnson & Morris II)*, 2017 NCBC LEXIS 89, at *15 (N.C. Super. Ct. Sept. 28, 2017).

45. "A well established exception to this rule applies when the descriptive phrase in question has acquired 'secondary meaning.'" *Two Way Radio Serv., Inc.*, 322 N.C. at 814, 370 S.E.2d at 411. Secondary meaning exists when a business has used generic or descriptive words "for so long or so exclusively or when it has promoted its product to such an extent that the words do not register their literal meaning on the public mind but are instantly associated with one enterprise[.]"

*Staley*, 263 N.C. at 201–02, 139 S.E.2d at 187. In determining whether a mark has acquired secondary meaning, our courts look to the factors established by the Court of Appeals for the Fourth Circuit (the "Perini Factors"). *Johnson & Morris II*, 2017 NCBC LEXIS 89, at *15–16 (citing *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990)). The six Perini Factors are "(1) plaintiff's advertising expenditures; (2) consumer studies linking the mark to the source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark." *Johnson & Morris, PLLC v. Abdelbaky & Boes, PLLC (Johnson & Morris I)*, 2016 NCBC LEXIS 78, at *15 (N.C. Super. Ct. Oct. 11, 2016).

46. The Court first observes that the e-mail address, alamancefp@yahoo.com, which Plaintiff claims as its "trade name," consists almost entirely of the name of a county and the domain name of Yahoo!, a separate company that provides free e-mail services to the public. Plaintiff's e-mail address, by itself, is likely a generic or descriptive name that is not entitled to trade name protection absent secondary meaning. *See id.* at *12–13.

47. Plaintiff has failed to allege any facts from which the Court could conclude that alamancefp@yahoo.com could have acquired secondary meaning for purposes of the Motion. *See Old S. Apparel, LLC v. JEB Designs, Inc.*, 272 F. Supp. 3d 734, 738–39 (E.D.N.C. 2017) (concluding that plaintiff failed to state a claim for trademark infringement under federal or North Carolina law where plaintiff failed to allege facts that would show how its purported mark has secondary meaning). Finally, even had

Plaintiff adequately alleged that it owned a protectable trade name, Plaintiff has not alleged that any Defendant has used Plaintiff's trade name or a confusingly similar name. Thus, even if a misappropriation of trade name case could be premised on Kimball's alleged conduct, Plaintiff would fail to state a claim because it has not alleged the existence of a protectable trade name.

48. Therefore, the Court concludes that Plaintiff's misappropriation of trade name claim should be dismissed.

### D. Breach of Duty of Loyalty

49. Plaintiff alleges that Lindley and Kimball, as employees of Plaintiff, owed Plaintiff a duty of loyalty that obligated them to act in the best interest of Plaintiff and its patients. (Am. Compl. ¶ 38.) Plaintiff alleges that Lindley and Kimball breached this duty of loyalty by performing unnecessary allergy testing on patients, paying for personal benefits without authorization, misusing patient information, interfering in Plaintiff's business relationships, and preparing a new business while employed by Plaintiff. (Am. Compl. ¶ 39.)

50. Defendants contend that Plaintiff's breach of the duty of loyalty claim must be dismissed because a standard employer-employee relationship does not give rise to a fiduciary duty under North Carolina law and Plaintiff does not allege the existence of a fiduciary relationship apart from Kimball and Lindley's status as employees of Plaintiff. (Defs.' Br. Supp. 6.) In response, Plaintiff's counsel represented in its brief in opposition to the Motion that Plaintiff does not wish to be

heard on the Motion as to this claim, thus conceding the correctness of the Motion as it relates to this claim. (Pl.'s Br. Opp'n 3.)

51. Accordingly, the Court concludes that Plaintiff has failed to state a claim against Lindley or Kimball for breach of the duty of loyalty and this claim is dismissed.

### E. Unfair or Deceptive Acts or Practices

52. Plaintiff alleges that Lindley committed an unfair or deceptive act or practice by "fraudulently obtaining patient information," misappropriating Plaintiff's trade name and internet contacts, soliciting Plaintiff's patients, and using Plaintiff's funds to pay unauthorized expenses. (Am. Compl. ¶ 43.) Plaintiff further alleges that Lindley's conduct of forming her own business while employed by Plaintiff and soliciting Plaintiff's patients was "in or affecting commerce" as defined by the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA" or the "Act"). (Am. Compl. ¶¶ 41–42.)

53. The Amended Complaint alleges a UDTP claim against Lindley alone. Further, because the Amended Complaint alleges that only Kimball misappropriated Plaintiff's trade name and internet contacts, such conduct cannot form part of the basis for a UDTP claim against Lindley. Accordingly, Plaintiff's UDTP claim against Lindley is premised on allegations that she fraudulently obtained Plaintiff's patient information to solicit patients to PPC and used Plaintiff's funds to pay expenses without authorization.

54. Defendants argue that Plaintiff's UDTP claim is barred by the learned profession exemption. (Defs.' Br. Supp. 6.) Defendants contend that Lindley, as a licensed nurse practitioner, is entitled to the exemption because her alleged conduct fell within the broad definition of "rendering of professional services" that exempts her from the UDTPA. (Defs.' Br. Supp. 6–7.)

55. The UDTPA declares unlawful "unfair or deceptive acts or practices in or affecting commerce[.]" N.C. Gen. Stat. § 75-1.1(a). The Act defines commerce to include "all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." *Id.* § 75-1.1(b). For the learned profession exemption to apply, (1) the entity or person whose conduct is being challenged must be a member of a learned profession, and (2) the challenged conduct must constitute a rendering of professional services. *Wheeless v. Maria Parham Med. Ctr., Inc.*, 237 N.C. App. 584, 589, 768 S.E.2d 119, 123 (2014); *Reid v. Ayers*, 138 N.C. App. 261, 266, 531 S.E.2d 231, 235 (2000).

56. Our courts have interpreted membership in a learned profession broadly, including both individuals and entities, largely in the medical and legal fields. *Shelton v. Duke Univ. Health Sys., Inc.*, 179 N.C. App. 120, 126, 633 S.E.2d 113, 117 (2006) (hospitals); *Reid*, 138 N.C. App. at 266, 531 S.E.2d at 235 (law firms and attorneys); *Sykes v. Health Network Sols, Inc.*, 2017 NCBC LEXIS 73, at *54–55 (N.C. Super. Ct. Aug. 18, 2017) (chiropractors). Moreover, our Court of Appeals "has made clear that unfair and deceptive acts committed by medical professionals are not

included within the prohibition of [N.C. Gen. Stat.] § 75-1.1(a)." *Wheeless*, 237 N.C. App. at 590, 768 S.E.2d at 123.

57. Despite Plaintiff's suggestion in its brief that a nurse practitioner is, arguably, "not contemplated under the learned profession exception," at the hearing, Plaintiff's counsel conceded that a nurse practitioner is a medical professional. (Pl.'s Br. Opp'n 4.) Plaintiff instead argues that the exception applies to unfair or deceptive conduct directed toward a member of the consuming public, but not to anticompetitive conduct between two learned professionals. (Pl.'s Br. Opp'n 4.) Thus, the issue before the Court is whether Lindley's alleged conduct constituted the rendering of professional services such that Plaintiff's UDTP claim is barred.

58. "It is well-settled by our Courts that a matter affecting the professional services rendered by members of a learned profession . . . falls within the exception." *Wheeless*, 237 N.C. App. at 590, 768 S.E.2d at 123 (quotation marks omitted). "This exception for medical professionals has been broadly interpreted by this Court . . . ." *Shelton*, 179 N.C. App. at 126, 633 S.E.2d at 117. Further, and contrary to Plaintiff's argument, it has been held to apply where a plaintiff alleges that the unfair or deceptive acts constituted anticompetitive conduct directed by one learned professional at another. *Cameron v. New Hanover Mem'l Hosp., Inc.*, 58 N.C. App. 414, 446, 293 S.E.2d 901, 920 (1982) (rejecting plaintiffs' argument that the learned profession exemption does not exclude from coverage anticompetitive conduct involving commercial activity); *Wheeless*, 237 N.C. App. at 590–91, 768 S.E.2d at 123 (concluding that defendant-medical professionals' sending of an anonymous letter to

the medical board about plaintiff-medical professional was within the exemption, notwithstanding plaintiff's allegations that defendants illegally accessed and used confidential peer review and patient records and acted out of malice and for financial gain).

59.   Given the breadth with which our courts have applied the learned profession exemption, the Court concludes that the face of the Amended Complaint reveals that the UDTP claim against Lindley is barred.  Plaintiff complains that Lindley engaged in unfair and deceptive conduct by creating a business within Plaintiff's business, illegally obtaining patient data, using that data to solicit Plaintiff's patients, paying unauthorized personal expenses, and attempting to give Dr. Niemeyer kickbacks for allergy testing referrals.  (Am. Compl. ¶¶ 11–13, 15–16, 18, 41–43; Pl.'s Br. Opp'n 4.)  In its simplest form, Plaintiff's claim is based on allegations that Lindley began an allergy testing practice, obtained patient information, solicited patients, and attempted to secure a referral agreement.

60.   In considering whether a defendant's conduct is exempt from the UDTPA's definition of commerce, the Court is not concerned with whether the conduct runs afoul of other legal or ethical standards, but only whether the conduct affects the professional services rendered by members of a learned profession.  *Burgess v. Busby*, 142 N.C. App. 393, 406–07, 544 S.E.2d 4, 11–12 (2001) (holding that dismissal of UDTP claim was proper because defendant-doctor's conduct in sending a letter naming patients who had sued defendant and jurors who found against defendant to other medical professionals to discourage those professionals from treating the

persons named in the letter was within the exemption); *Gaunt v. Pittaway*, 139 N.C. App. 778, 784, 534 S.E.2d 660, 664 (2000) ("[M]edical professionals are expressly excluded from the scope of [N.C. Gen. Stat.] § 75-1.1(a) and thus it clearly does not follow that a statement by a medical professional, criminal or otherwise, is governed by this particular statute."). Accordingly, the Court concludes that Lindley's alleged conduct, all of which related to the provision of allergy testing services and communications with patients, falls within the learned profession exemption.

61. Apart from the question of whether Defendants' conduct is excluded from the UDTPA's definition of commerce, the allegations that form the basis for Plaintiff's UDTP claim against Lindley are the same allegations that constitute Lindley's alleged breaches of her employment agreement. (*Compare* Am. Compl. ¶¶ 20–24, *with* Am. Compl. ¶¶ 41–43.) Our courts generally disfavor allowing UDTP claims to "piggyback" on breach of contract claims, "[b]ecause section 75-1.1 and contract law serve different purposes and rest on divergent remedial principles[.]" *Post v. Avita Drugs, LLC*, 2017 NCBC LEXIS 95, at \*9 (N.C. Super. Ct. Oct. 11, 2017). Therefore, absent "some type of egregious or aggravating circumstances," *Dalton v. Camp*, 353 N.C. 647, 657, 548 S.E.2d 704, 711 (2001) (emphasis omitted), "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [N.C. Gen. Stat.] § 75-1.1[,]" *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992). Circumstances that are sufficiently egregious or aggravating to permit a UDTP claim based on conduct that occurred during the course of contractual performance involve "clear deception," such as forgery,

destruction of documents, or concealment of the breach combined with other acts to deter plaintiff from investigating the conduct. *Post*, 2017 NCBC LEXIS 95, at *11–12.

62. Upon reviewing the Amended Complaint, and taking all inferences in Plaintiff's favor, the factual allegations are devoid of sufficiently egregious or aggravating conduct on the party of Lindley that would permit Plaintiff to assert a UDTP claim based on Lindley's alleged breach of contract. The failure to plead such conduct serves as an additional basis for dismissal of Plaintiff's UDTP claim.

63. Having concluded both that Plaintiff's UDTP claim is barred by the learned profession exemption and that Lindley's alleged breach of contract was not sufficiently egregious to support a UDTP claim, the Court, therefore, concludes that Plaintiff fails to state a claim for UDTP. Plaintiff's UDTP claim is, accordingly, dismissed.

## F. Fraud

64. Plaintiff alleges that Lindley and Kimball have engaged in fraud by telling Plaintiff's patients since the fall of 2017 that Dr. Niemeyer was about to be "shut down" and could no longer treat patients. (Am. Compl. ¶ 54.) The Amended Complaint alleges that Lindley and Kimball's statements were false, made with the intent to deceive patients and solicit them to PPC, and that the false statements did induce patients to leave Plaintiff's practice, thereby harming Plaintiff. (Am. Compl. ¶¶ 54–57.)

65. To state a claim for fraud, a complaint must allege "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Hudgins v. Wagoner*, 204 N.C. App. 480, 486, 694 S.E.2d 436, 442 (2010). "Additionally, any reliance on the allegedly false representations must be reasonable." *Forbis v. Neale*, 361 N.C. 519, 527, 649 S.E.2d 382, 388 (2007).

66. Defendants argue that Plaintiff fails to state a claim for fraud, among other reasons, because North Carolina has not recognized fraud claims based on false statements made to a non-party that caused the non-party to take action that harmed plaintiff. (Defs.' Br. Supp. 8.) Plaintiff's brief did not address this argument. At the hearing, Plaintiff's counsel argued that the Amended Complaint alleges sufficient facts to state a claim for constructive fraud based on allegations demonstrating a relationship of trust and confidence between Plaintiff, on the one hand, and Lindley and especially Kimball, on the other. The Court rejects this argument. Plaintiff's Amended Complaint does not allege a fiduciary relationship between Plaintiff and any of the Defendants.

67. As to Plaintiff's fraud claim based on Lindley and Kimball's alleged false statements to Plaintiff's patients, North Carolina courts have not addressed whether the reliance requirement for a fraud claim may be premised on a defendant's false representations to a third party on which the third party relies to plaintiff's

detriment.[1]  Furthermore, the Court is unaware of any court that currently permits common law fraud claims to be established by third-party reliance.  Even in New York, which has the most robust (albeit conflicting) case law discussing the viability of third-party reliance claims, the law has been less than clear.  *Jordan v. Mirra*, 2017 U.S. Dist. LEXIS 149034, at \*56–57 (Dist. Del. Sept. 14, 2017) (unpublished) ("Federal and state courts in New York are divided as to whether a fraud-based claim may be predicated on third-party reliance.").  However, it appears that New York, the jurisdiction most willing to entertain the possibility of third-party reliance claims, has concluded that allegations of third-party reliance cannot establish a claim for common law fraud.  *See, e.g.*, *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 827, 59 N.E.3d 485, 492 (N.Y. Ct. App. 2016) ("[U]nder New York law, such third-party reliance does not satisfy the reliance element of a fraud claim.").

68.     Of note, the District Court for the Middle District of North Carolina has suggested that North Carolina law would recognize such a claim in appropriate circumstances because North Carolina courts recognize that a professional may be liable for negligently performing a contract that proximately causes foreseeable

---

[1] Apart from the typical fraud claim wherein plaintiff is alleged to have relied on a false statement that defendant made directly to plaintiff ("first-party reliance"), courts in this and other jurisdictions have also considered whether a plaintiff may state a fraud claim where (1) defendant made a false representation to a third party intending that the information would reach plaintiff and be relied on by plaintiff ("indirect reliance"), *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 628 (S.D.N.Y. 2006); *Bucci v. Burns*, 2018 NCBC LEXIS 37, at \*13–17 (N.C. Super. Ct. Apr. 25, 2018), and (2) where defendant made a false representation to a third party on which the third party relied, thereby causing harm to plaintiff ("third-party reliance").  Although courts do not use these terms consistently, the designations given in the preceding sentence will be used here for clarity.

injury to a third person and "it would be surprising if the same were not true in cases of intentional deception carried out for the purpose of harming a third party." *Bardes v. Mass Mut. Life Ins. Co.*, 932 F. Supp. 2d 636, 640 (M.D.N.C. 2013).

69.    The Court is doubtful that our appellate courts would recognize fraud claims premised on third-party reliance.  However, even assuming *arguendo* that third-party reliance claims were recognized in North Carolina, the Amended Complaint fails to allege that any patient justifiably relied on Kimball or Lindley's allegedly fraudulent statements.  The Amended Complaint, therefore, fails to state a claim for fraud premised on third-party reliance, even were such a claim recognized in North Carolina.

70.    Apart from whether the type of fraud claim alleged by Plaintiff is cognizable under North Carolina law, Defendants also argue that Plaintiff's fraud claim is subject to dismissal because it fails to satisfy the heightened pleading requirements of Rule 9(b).  (Defs.' Br. Supp. 8–9.)  Specifically, Defendants argue that Plaintiff provides only a vague timeframe of when the alleged fraudulent statements were made and makes no allegation as to the place where the misrepresentations were made.  (Defs.' Br. Supp. 8–9.)

71.    Our Rules require that a pleading setting forth a fraud claim state "the circumstances constituting fraud . . . with particularity." N.C. Gen. Stat. § 1A-1, Rule 9(b).  "[I]n pleading actual fraud the particularity requirement is met by alleging time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts

or representations." *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 610, 659 S.E.2d 442, 449 (2008) (emphasis omitted) (quoting *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981)).

72. Plaintiff alleges that, beginning in the fall of 2017, Lindley and Kimball told Plaintiff's patients that Dr. Niemeyer was about to be "shut down" and would no longer be able to treat patients. (Am. Compl. ¶ 54.) Plaintiff further alleges that these misstatements were intended to solicit Plaintiff's patients to PPC and that they deceived Plaintiff's patients into leaving Plaintiff's medical practice, thereby harming Plaintiff. (Am. Compl. ¶¶ 55–57.)

73. The allegations reveal that Plaintiff has stated with particularity the content of the fraudulent representation, identity of the persons making the representation, and what was obtained as a result of the fraudulent representations. Although the time of the representations is given only as a broad range, the Court concludes that such an allegation is sufficient, on the facts alleged, to satisfy Rule 9(b). "A requirement of specificity is not a requirement of perfect and complete specificity." *Hudgins*, 204 N.C. App. at 487, 694 S.E.2d at 443.

74. However, Plaintiff makes no allegation as to where or how these representations were made to Plaintiff's patients. Although in some instances a failure to state the place a misrepresentation was made may be forgiven, the Court concludes that the Amended Complaint's failure to allege the place where Kimball and Lindley's alleged misrepresentations were made runs afoul of Rule 9(b)'s specificity requirement. *Id.* at 489 n.7, 694 S.E.2d at 444 n.7 (concluding that failure

to allege the exact place the fraudulent misrepresentation was made or whether it occurred in a face-to-face conversation or over telephone was not fatal where defendants' answer admitted that the conversation occurred on the date alleged).

75.     Based on the foregoing, the Court concludes that the face of the Amended Complaint reveals an absence of facts sufficient to state a good fraud claim and fails to satisfy Rule 9(b)'s particularity requirement.  Therefore, Plaintiff's fraud claim is dismissed.

## G.     **Punitive Damages**

76.     Defendants also request that the Court strike Plaintiff's request for punitive damages because only Plaintiff's breach of contract claim against Lindley should survive dismissal and punitive damages are not permissible in ordinary breach of contract actions.  (Defs.' Br. Supp. 9.)

77.     Plaintiff's request for punitive damages is named in the Amended Complaint as Count VI and does not clearly identify the claims for which Plaintiff seeks punitive damages.  (Am. Compl. ¶¶ 44–45.)  Instead, the Amended Complaint alleges only that Lindley and Kimball's conduct "has been willful, wanton, malicious, and fraudulent[.]"  (Am. Compl. ¶ 45.)

78.     A request for punitive damages is not a separate cause of action but is a type of relief that may be awarded in appropriate circumstances.  *Holley v. Hercules, Inc.*, 86 N.C. App. 624, 627, 359 S.E.2d 47, 49 (1987) ("[T]here is no cause of action for punitive damages . . . . Causes of action are the vehicles by which legal rights and remedies are enforced, but no one has a legal right to punitive damages." (emphasis

omitted)). Punitive damages may be an appropriate remedy "to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C. Gen. Stat. § 1D-1. However, such damages may only be awarded if the claimant, in addition to proving that the defendant is liable for compensatory damages, also proves the presence of fraud, malice, or willful or wanton conduct. *Id.* § 1D-15. Generally, a party cannot recover punitive damages for breach of contract. *Richardson v. Bank of Am., N.A.*, 182 N.C. App. 531, 558, 643 S.E.2d 410, 427 (2007).

79. Having concluded that all of Plaintiff's claims are subject to dismissal, save for Plaintiff's breach of contract claim against Lindley, the Court further concludes that Plaintiff's request for punitive damages should be stricken from the Amended Complaint. A review of the Amended Complaint reveals that Plaintiff fails to allege any aggravating factor that could support a punitive damages award premised solely on Lindley's alleged breach of contract.

80. Therefore, the Motion as to Plaintiff's request for punitive damages is granted.

## V. CONCLUSION

81. For the foregoing reasons, the Court **ORDERS** as follows:

    A. The Court **GRANTS** the Motion as to Plaintiff's claim for breach of contract against Kimball and PCC and Plaintiff's claim for tortious interference with contract and tortious interference with prospective

economic advantage, and these claims are dismissed without prejudice.

B.  The Court **GRANTS** the Motion as to Plaintiff's claims for misappropriation of trade name, breach of the duty of loyalty, UDTP, and fraud, and these claims are dismissed with prejudice.

C.  The Court **GRANTS** the Motion as to Plaintiff's request for punitive damages, and the request for punitive damages is dismissed without prejudice.

**SO ORDERED**, this the 14th day of August, 2018.


/s/ Michael L. Robinson

Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases